Steven A. Morris, Esq. (SBN: 126193)
Jonathan M. Deer, Esq. (SBN: 164837)
morris@taflaw.net; jdeer@taflaw.net
Turner, Aubert & Friedman, LLP
8383 Wilshire Blvd., Ste. 510
Beverly Hills, CA 90211
(323) 653-3900 (telephone)
(323) 653-3021 (facsimile)

Attorneys for Plaintiff
Steven Feher

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| STEVEN FEHER,<br><br>                    Plaintiff,<br><br>           vs.<br><br>SCOTT J. FAUX, an individual;<br>FAUX, WALKER, & JONES, PLLC, a<br>Utah professional limited liability<br>company; and BARNEY, MCKENNA<br>& OMSTEAD, PC, a Utah professional<br>corporation;<br><br>                    Defendants | Case No.:<br><br>**COMPLAINT FOR:**<br><br>**1. BREACH OF FIDUCIARY DUTY**<br>**2. NEGLIGENCE**<br><br>[Demand For Jury Trial] |

Plaintiff, STEVEN FEHER, sues defendants and alleges:

1.      This case involves attorneys who took an undisclosed $100,000 kickback from an insurance broker in exchange for recommending completely inappropriate life insurance policies to their client as part of an improper financial plan.  They continued to cover up the fact that the policies and the overall financial plan never should have been recommended or purchased in the first place.  The truth was only discovered when Defendant Faux admitted the kickback under oath

in deposition.  The consequences of these breaches of fiduciary duties were that Plaintiff had most of his life's savings wiped out in the improper transactions.

2.      Plaintiff is an individual who resides in Los Angeles, California.

3.      Defendant SCOTT J. FAUX ("**Faux**") is an individual and a resident of the State of Utah.  He is an attorney licensed to practice in the State of Utah and maintains his practice there.  He is also a CPA, but at all times referred to herein, he was practicing law.

4.      Defendant FAUX, WALKER, & JONES, PLLC (the "**FWJ FIRM**") is a Utah professional limited liability company with its principal place of business in Utah.  Scott Faux is a principal of the firm and has been since its formation in 2012.  Based upon information and belief, at no time material to this complaint did the FWJ Firm have any attorneys who were licensed to practice in California, the state in which Feher resided at the time the FWJ Firm provided him legal services.

5.      Defendant BARNEY, MCKENNA & OMSTEAD, PC (the "**BMO Firm**"), is a Utah professional corporation with its principal place of business in the State of Utah.  Based upon information and belief, at no time material to this complaint did the BMO Firm have any attorneys who were licensed to practice in either California or Hawaii, the two states in which Feher resided at the time the BMO Firm provided him legal services.  Faux was an attorney associated with, employed by and/or a partner of the BMO Firm and providing services with the BMO Firm from 2005 until 2012.

6.      Mr. Feher is an inventor who worked for decades on an invention which finally began to provide substantial income around 2005.

7.      Around that time, Mr. Feher saw an advertisement by Faux and the BMO Firm.  Through the advertisement, they offered to provide legal services relating to financial planning and tax advice.  Mr. Feher responded to the advertisement, whereupon Faux and BMO began providing Mr. Feher legal

services, including tax planning, financial planning, corporate planning and preparation of tax returns.

8.     Mr. Feher had absolutely no connection to the State of Utah, did not live in Utah, and had no business dealings whatsoever in the State of Utah. Mr. Feher has never been to Utah.

9.     Mr. Feher was not sophisticated in any of the matters for which Faux and the BMO Firm represented him.  Prior to 2005, Mr. Feher never earned substantial income to worry about tax or financial planning.  Mr. Feher relied on Faux and the BMO Firm for their legal advice and legal services.

10.     As part of those services, Faux and the BMO Firm reviewed Mr. Feher's finances and prepared his tax returns.  They were very familiar with his income and his income streams, which came from patent royalties for his inventions.

11.     In 2008, Faux advised Mr. Feher that because substantially all of the income he was earning came from one of his patented inventions would end in the first quarter of 2014, Mr. Feher needed to create a financial investment plan now and invest his money in order to generate a return of $20,000 or more per month starting in the second quarter of 2014 if he wished to continue his lifestyle.  Mr. Feher desired advice and counsel in this regard.

12.     As part of providing such advice to Mr. Feher, in December, 2008, Faux and an insurance broker named Carpenter flew to Hawaii, where Mr. Feher lived at the time, to meet with him.  They intended to sell him a high value life insurance plan for millions of dollars as the investment vehicle suitable to his situation to generate $20,000 per month after his patent income ran out.

13.     At the meeting, Faux "recommended" to Mr. Feher that he buy a $16 million Penn Mutual Life Insurance policy because, he said, it would allow him to build equity in the policy with his current resources and then borrow against it after his patent income stopped, so that he would be able to withdraw at least $20,000 a

month for the rest of his life.  At that time, Mr. Feher had some awareness of annuities, but had no experience whatsoever with life insurance or life insurance as an investment vehicle.  Faux and Carpenter told Mr. Feher that the life insurance plan they were recommending was, "better than an annuity."  The commission for selling a $16 million life insurance policy is enormous, often in excess of the entirety of the first year's premium; the commission for selling an annuity pales by comparison.

14.     Unbeknownst to Mr. Feher, Faux had a business arrangement with Carpenter to receive $100,000 in kickbacks if Carpenter sold the life insurance policy to Mr. Feher.

15.     Despite recommending the policy to receive a referral fee, Faux and the BMO Firm conducted no investigation, evaluation or analysis about the suitability of the policy for Mr. Feher's needs. Neither Faux nor BMO informed Mr. Feher that it had not independently investigated and determined the suitability of the proposed life insurance for Mr. Feher's needs and was merely repeating what they had been told by Carpenter to receive the fee.  Mr. Feher was led to believe that Faux and BMO had in fact done so and that as a result of that effort Carpenter was selected as the sales person to achieve the goals Faux and the BMO Firm has developed.  Mr. Feher reposed a great deal of trust and confidence in Faux and BMO as his counsel and trusted advisors, and had no awareness or relationship with Carpenter who was brought by Faux to the first meeting in Hawaii mentioned above.  Carpenter would receive $400,000 as a commission on the policy in the first year alone.

16.     The fact is, the Penn Mutual Life Insurance policies (and the additional policies which would follow) were utterly inappropriate for Mr. Feher's needs, would not perform as represented, could not be afforded and were otherwise totally and completely unnecessary.  The policy would not return $20,000 a month when Mr. Feher's income ran out; instead, Mr. Feher would be required to pay

premiums after a point in time Faux knew Mr. Feher would have no income.  Mr. Feher had no family, no children, no spouse, nor living parents and had absolutely no need for life insurance. Mr. Feher had no one on whom to bestow the enormous death benefit and had no interest in death benefits or any sort of testamentary transfer.  Mr. Feher was only interested in his financial security during his lifetime. He purchased the life insurance because Faux and the BMO Firm advised him that he needed to do so to be able to fund his lifestyle after his patent expired and his income ran out in the first quarter of 2014.

17.    Neither Faux nor the BMO Firm informed Mr. Feher that they had no independent opinion about the appropriateness of the insurance policy or that they were earning a commission of $100,000 on the sale of the policy.  They did not provide to Mr. Feher any disclosure of potential and actual conflicts of interest, nor obtain any waiver of conflicts of interest.

18.    Mr. Feher purchased the life insurance based upon Faux and BMO's recommendation and followed Faux's advice and counsel with respect thereto. Essentially, Mr. Feher did what Faux told him to do in this regard.

19.    In 2010, Faux and Carpenter visited Mr. Feher again, this time in Los Angeles, whereupon Faux recommended that Mr. Feher purchase an *additional* $10 million Penn Mutual Life Insurance policy, bringing the total up to $26 million in life insurance.  According to Faux and Carpenter, this purchase would increase the amount of return Mr. Feher would get when he started needing the money after his income ran out in the first quarter of 2014.

20.    In reality, the policies were utterly unsuitable for the purpose Mr. Feher requested or required.  They had continuing premiums of at least $750,000 per year and, in addition, required Mr. Feher to pay interest on the sums borrowed against them.  This plan never could have achieved the result Faux promised and the very reason Faux purportedly recommended the policy.  Further, Mr. Feher did not need a life insurance policy since he had no spouse, no children, no

dependents, nor any close relatives. He had no one to leave any death benefits to, all of which Faux and the BMO Firm well knew. Mr. Feher had not even prepared a will or a trust or any other testamentary instrument to dispose of the enormous death benefit should he die. Had he passed, the death benefit would have gone to some remote relative Mr. Feher did not know or escheated to the state.

21.     As part of the financial plan, around 2009 and 2010, Faux advised Mr. Feher that he now needed to set up a complicated insurance based financial planning scheme that involved creating a captive insurance company, creating a separate limited liability company to own each of Mr. Feher's patents, and having each LLC purchase insurance from the captive insurance company. The captive insurance company would invest the "premiums" (which was money funded by Mr. Feher) into the Penn Mutual life insurance policies which, according to Faux and the BMO Firm, were on track to build sufficient value by the second quarter of 2014 that Mr. Feher would be able to borrow against them and take out a minimum of $20,000 per month for the rest of his life.

22.     According to Faux and the BMO Firm, the captive insurance scheme was necessary and advisable because it would avoid tax payments that would otherwise be due and allow the funds reaped from the substantial tax savings to be invested into the life insurance policies, thus building equity faster and providing an even better return. Once again, Mr. Feher, trusting and relying on the advice and counsel of Faux and BMO, did as they directed in this regard.

23.     To carry out the financial plan, Faux established more than a dozen business entities including limited liability companies and corporations, hired third parties as consultants to carry out various tasks related to setting up a captive insurance company, provided opinion letters for purposes of obtaining the insurance policies and also legitimizing the insurable interest for the captive insurance company, and hired an accountant with which he regularly worked to handle bookkeeping and accounting for the financial plan. Faux gave himself an

interest in some of the entities and he named his accountant as a manager of most of them.  In other words, Faux either directly or through his accountant controlled the entire enterprise on behalf of Mr. Feher as lawyer and his fiduciary.  Mr. Feher lacked the experience or business sophistication to understand the financial plan or manage it himself.  He relied upon Faux, who recommended, designed and set up the complex plan.  Mr. Feher followed Faux's advice.

24.     Unbeknownst to Mr. Feher, the entire plan was not suitable for his needs.  First, it was set up to service premiums on the Penn Mutual policies, which never could have generated the income required.  Second, the plan was extremely expensive to create and maintain.  Any tax benefit was lost both because of the expense of the enterprise and because any amounts saved were then invested into the bogus insurance policies.

25.     In 2011, Faux resigned as president of the captive insurance company and appointed Carpenter (the insurance broker) as president in his place.

26.     In early 2012, Faux assisted Carpenter in persuading Mr. Feher to purchase a "replacement" insurance policy from Aviva Life Insurance for a total $18 million in insurance coverage.  The new policy was purportedly "better suited" to obtain the income stream Mr. Feher required.  Mr. Feher was told and lead to believe that there were no additional costs to this new policy and all of the premiums would be paid through the structure already established by Faux.  Once again, Mr. Feher did as Faux advised and recommended.

27.     Unbeknownst to Mr. Feher, the change in policies was classic churning that was extremely expensive.  The surrender fee on one of the old policies was $228,000, and the other policy was simply allowed to lapse, so all of its value was lost.  The new policy had even higher premiums than the old policies. In no way could the new policy serve to meet Mr. Feher's needs, nor could he afford them.  He didn't need life insurance.  Rather, the sale was motivated solely by the desire to generate additional commissions. In or around April of 2012, Faux

formed a new law firm, the FJW Firm, and continued to provide legal advice and counsel to Mr. Feher through his new law firm.

28.    In 2014, Mr. Feher was informed by another insurance broker that the policies he had been sold were not suitable for his needs.  He expressed these concerns to Faux, who continued to act as Mr. Feher's attorney and advised him to send inquiries to Carpenter.  Faux even told him what to say.

29.    Faux never informed Mr. Feher that Faux (and through him, his new law firm the FWJ Firm) had a deep conflict of interest in providing such advice, nor did they advise Mr. Feher to seek independent legal counsel.  Faux did not inform Mr. Feher that he had not vetted, analyzed or reviewed the insurance policies but continued to pretend that he was acting on behalf of Mr. Feher, in his best interest, when in fact Faux was only giving "advice" to protect himself and his firms.  Faux failed to inform Mr. Feher that the entire insurance scheme was bogus. Mr. Feher, unaware, continued to rely on and have trust and confidence in Faux's advice.

30.    Faux and the FWJ Firm continued to advise Mr. Feher how to proceed with respect to the insurance policies into 2014, but the advice was ineffectual.  At no time did Faux and the FWJ Firm disclose the $100,000 kickback Faux had participated in to sell the policies in the first place.  Had they done so, Mr. Feher would have sought independent legal advice.

31.    In the first quarter of 2014, Mr. Feher's income from his patent ran out and he had no source of income to pay continuing premiums for the insurance policy, just as Faux had known would be the case when he recommended the life insurance investments to Mr. Feher.

32.    In 2014, the Aviva life insurance policy lapsed.  In other words, the insurance investment was a total failure for its intended purposes.  It could never have generated at least $20,000 in income to Mr. Feher.  Rather, it required the

payment of a million dollars per year just to keep it in force.  Insurance Mr. Feher did not need.

33.     Mr. Feher filed a lawsuit against the broker and the insurance companies for return of his premiums.   Shortly before trial in 2015, the deposition of Faux was taken in that case.  At the deposition, Faux admitted taking $100,000 from Carpenter (as a fee for assisting in selling the policy to Mr. Feher.)

34.     Mr. Feher settled with the insurance carriers in that case for a partial return of his premiums.  He seeks the balance of his damages in this case, and other damages based upon defendants' breaches of their fiduciary duties as his attorneys and their carelessness in representing him.

## FIRST CAUSE OF ACTION

### (Breach Of Fiduciary Duty against all defendants)

35.     Plaintiff incorporates paragraphs 1 through 34 as if re-alleged herein.

36.     Every lawyer owes a fiduciary duty to his client, and among the fiduciary duties of a lawyer is to act and advise in the client's best interest, represent each client competently and with undivided loyalty.

37.     By taking the acts alleged above, Defendants each breached their fiduciary duties to Plaintiff.

38.     As a direct and proximate result of Defendants' breaches of fiduciary duties, Plaintiff was damaged in the amount of the premiums, fees and expenses he paid in connection with the insurance/investment plan, and other damages, (less any amounts recovered from other parties), according to proof at trial.

39.     Defendants' acts were reprehensible, fraudulent and in blatant violation of law and policy inasmuch as Defendants were well aware of their duties as Plaintiff's attorney, his reliance upon them, Plaintiffs' financial circumstances and the dire consequences that would befall Plaintiff if his life savings were exploited in the manner described above, and they intended to and did personally

and substantially benefit at Plaintiff's expense.  Wherefore, Plaintiff is entitled to punitive and exemplary damages.

## SECOND CAUSE OF ACTION

### (Negligence against all defendants)

40.     Plaintiff incorporates paragraphs 1 through 34 as if re-alleged herein.

41.     As part of an attorney's duty to his or her client, the attorney has an obligation to use reasonable care and skill in carrying out the attorney's representation.

42.     Defendants and each of them breached their duties by doing the acts alleged hereinabove negligently.

43.     As a direct and proximate result of Defendants breaches of their duties, Plaintiff was damaged in the amount of the premiums, fees and expenses he paid in connection with the insurance/investment plan, and other damages, (less any amounts recovered from other parties), according to proof at trial.

WHEREFORE, Plaintiff prays for judgment as follows:

1.     Compensatory damages in the amount of $4,500,000 and according to proof at trial;

2.     Exemplary and punitive damages;

3.     Interest;

4.     Costs;

5.     Attorney's fees pursuant to California Code of Civil Procedure §1029.8(a); and

//

//

//

//

//

6.      Such other and further relief as the Court may deem just and proper.

Dated: December 23, 2015                    Respectfully submitted,


_____/S/_____
Steven Morris, Esq.
Turner Aubert & Friedman, LLP
Attorneys for Plaintiff
Steven Feher



Plaintiff hereby demands a jury trial.



Dated: December 23, 2015                    Respectfully submitted,


_____/S/_____
Steven Morris, Esq.
Turner Aubert & Friedman, LLP
Attorneys for Plaintiff
Steven Feher